**In the Matter of SEARCHES CONDUCTED ON MARCH 5, 1980.**

**Frank P. BALISTRIERI, Joseph P. Balistrieri, John J. Balistrieri, La Scala Restaurant, Alioto Distributing, Inc., H&G Amusement Co., Dentice Amusement Co., Leonardo's Pasta House, Movants,**

**v.**

**UNITED STATES of America, Respondent.**

**Nos. 80–34M to 80–42M.**

United States District Court,
E. D. Wisconsin.

Sept. 23, 1980.

James M. Shellow, Shellow & Shellow, Milwaukee, Wis., movants.

Michael J. Trost, Asst. U. S. Atty., Milwaukee, Wis., for respondent.

## MEMORANDUM AND ORDER

WARREN, District Judge:

Pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, petitioners request the return of over $200,000.00 in cash, business records and other property seized on March 5, 1980 at various locations in the Milwaukee area. The United States Attorney and Agents of the Federal Bureau of Investigation conducted the searches under warrants issued by this Court on March 4, 1980. The affidavits supporting the warrants were sealed by order of the Court and remained so until June 9, 1980. Certain of the materials substantiating these affidavits remain under seal.

Subsequent to filing their motion for return of property, petitioners moved for recusal of the Court pursuant to 28 U.S.C. §§ 144 and 455, and the Fifth and Sixth Amendments to the United States Constitution. Petitioners allege that the Court has made statements and engaged in actions demonstrating that it is biased and prejudiced against the petitioners.

## I. BACKGROUND INFORMATION

In support of the motion for recusal, the petitioners have filed a joint affidavit, together with a certificate of counsel, attesting to the good faith of the affiants and counsel in making the motion. Petitioners allege in their joint affidavit that the Court has a longstanding, personal, and extra–judicial bias and prejudice against the affiants and their business associates. They assert the bias and prejudice is demonstrated by the Court's actions during its tenure as the Attorney General of Wisconsin.

According to the affidavit, shortly after the Court assumed the office of Wisconsin Attorney General in January of 1969, it proposed a number of bills designed to combat organized crime in Wisconsin. In submitting the legislative proposal, the Court stated its belief that organized crime existed in Wisconsin. The affiants also assert on information and belief that the Court named Frank P. Balistrieri as the head of organized crime in the state.

In September of 1969, the Wisconsin Attorney General's Office began dissolution-ment proceedings against a number of corporations that had failed to file annual reports. According to the affiants, the initial proceedings were directed at businesses affiliated with the Balistrieri family. In addition, the Attorney General's Office assisted the Milwaukee County District Attorney's Office in filing a number of liquor law violations against firms allegedly associated with Frank P. Balistrieri. These activities were widely reported in the media, and the press inferred that the attack on organized crime was directed at Frank P. Balistrieri.

In October of 1969, the Court, as Attorney General, issued four complaints and requests for injunctions against reputed Balistrieri–linked taverns for not having workmen's compensation insurance. After Joseph P. Balistrieri appeared for the taverns and demonstrated that they had procured insurance, the Attorney General's Office dropped the request for injunctive relief. Shortly after discovering the problems surrounding the firms it had insured, the insurer cancelled the policies. Affiants assert the cancellation was due to the intervention of the Court, despite newspaper articles to the contrary. Affiants also point out that the actions of the Attorney General's Office regarding these complaints were subject to criticism by a judge in Milwaukee County who viewed them as mere publicity plays.

These actions also resulted in a lawsuit against the Court. In that case, it was alleged that the filing of the complaint against the "Ad Lib" was malicious and not based on fact. The case, however, was dis-

missed because the Attorney General was found to be immune from a suit for damages.

In November of 1969, the Attorney General's Task Force on Organized Crime, together with local authorities, conducted a raid on "The Scene," a nightclub in Milwaukee linked by newspaper articles with Frank P. Balistrieri. Because no one took responsibility for the club, it was shut down temporarily. As a result of this action, affiliates of Frank P. Balistrieri sued the Court individually and in its capacity as Attorney General. Several other people were also defendants in this suit. In the proceeding before United States District Judge James M. Doyle of the Western District of Wisconsin, lawyers for the plaintiffs charged that the Balistrieris were being harassed because of alleged "Mafia" connections and because the Court was engaged in a drive to obtain publicity to become Governor. A request for a temporary injunction was denied and shortly thereafter, the case was voluntarily dismissed by the plaintiffs.

In June of 1970, the Court, as the Attorney General, sent a report to the Chairman of the Common Council's Licensing Committee of Milwaukee which indicated that there were a number of actions pending against certain "Balistrieri linked taverns." In addition, the report allegedly identified Frank P. Balistrieri as the reputed head of the "La Cosa Nostra" family in Milwaukee. Despite this report, the Milwaukee Common Council voted to approve certain pending liquor licenses. As a result, the council was criticized in the media and in response, Joseph P. Balistrieri, in a reply editorial, defended his father stating, "the situation reached the acme of intolerance earlier this week when certain public officials, acting on half truths and lies, would have stopped members of my family and friends from the most basic right of earning a living and supporting their families in an honest, licensed enterprise." (Affidavit, ¶ 13C).

In October of 1971, in an article in the *Milwaukee Sentinel* discussing organized crime, the Court related how the Attorney General's Office had proceeded against the Balistrieri family. Then, in November of 1971, Frank P. Balistrieri was indicted by a federal grand jury. In announcing the indictment, then United States Attorney General John Mitchell acknowledged the assistance of the Wisconsin Attorney General in gathering the evidence for the indictment. The affiants conclude these events evince the Court's bias and prejudice.

## II. RECUSAL UNDER 28 U.S.C. § 144

Section 144 of Title 28 of the United States Code provides:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term [session] at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

When a party has filed an affidavit alleging personal bias or prejudice on the part of a judge before whom a matter is pending, that judge has the obligation to determine the legal sufficiency of the affidavit because only "[he] knows fully his own thoughts and feelings and the complete context of facts alleged." *United States v. Mitchell*, 377 F.Supp. 1312 at 1315 (D.D.C.); *see Saunders v. Piggly Wiggly Corp.*, 1 F.2d 582, 583 (W.D.Tenn.1922); Schwartz, *Disqualification for Bias in the Federal District Courts*, 11 U.Pitt.L.Rev. 415, 423 (1949); *but see*, Note, *Disqualification of Federal Judges for Bias or Prejudice*, 46 U. of Chi.L. Rev. 236, 265–66 (1978). In determining the sufficiency of the affidavits, the Court

must accept as true the facts stated in the affidavit, even if the Court knows they are false. *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921); *United States v. Jeffers*, 532 F.2d 1101 (7th Cir. 1976), *affirmed in part, vacated in part, sub nom., Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); *Hodgson v. Local 2, Distillery Workers*, 444 F.2d 1344 (2d Cir. 1971); *Peacock Records, Inc. v. Checker Records, Inc.*, 430 F.2d 85 (7th Cir. 1970), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1193, 28 L.Ed.2d 324 (1971); *Action Realty Co. v. Will*, 427 F.2d 843 (7th Cir. 1980); *United States v. Mitchell*, 377 F.Supp. 1312 (D.D.C.), *writ of mandamus denied per curiam sub nom., Mitchell v. Sirica*, 502 F.2d 375 (D.C.App.), *cert. denied*, 418 U.S. 955, 94 S.Ct. 3232, 41 L.Ed.2d 1177 (1974). The Court, however, is not constrained to accept the conclusions or opinions of the affiant and may consider the facts alleged in their proper context. *Action Realty Company v. Will*, 427 F.2d at 844; *Tenants & Owners in Opp. to R. v. U. S. Dept. of H.U.D.*, 338 F.Supp. 29 (N.D.Cal.1972).

■ The requirements that affidavits of recusal be specific, timely and accompanied by a counsel's certificate of good faith are designed to protect the integrity of the judicial system and prevent abuse of the recusal procedure. *See Rademacher v. City of Phoenix*, 442 F.Supp. 27, 29 (D.Ariz.1977) and *Town of East Haven v. Eastern Airlines, Inc.*, 304 F.Supp. 1223, 1225 (D.Conn. 1969). In addition, the threat of a perjury prosecution curtails an affiant from bringing frivolous motions lacking any factual basis.

■ The requirement that an affidavit be filed within ten days from the beginning of the term has been strictly construed in the courts. *See Eisler v. United States*, 83 U.S.App.D.C. 315, 170 F.2d 273 (1948); *Chafin v. United States*, 5 F.2d 592 (4th Cir.), *cert. denied*, 269 U.S. 552, 46 S.Ct. 18, 70 L.Ed. 407 (1925). The purpose of this strict rule is to insure that the statute not be used as a delaying tactic.

■ For the alleged bias or prejudice to be sufficient to require recusal, it "must stem from an extra–judicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966); *Wilks v. Israel*, 627 F.2d 32 (7th Cir. 1980). The bias or prejudice alleged must be personal and not judicial. Furthermore, the bias or prejudice must bear directly on the current proceeding. *United States v. Mitchell*, 377 F.Supp. at 1317. Moreover, the facts alleged in the affidavit "must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Berger v. United States*, 255 U.S. at 33, 41 S.Ct. at 233. The standard under section 144 is that of bias in fact. *Parrish v. Board of Commissioners*, 524 F.2d 98 (5th Cir. 1975) (*en banc*), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); Note, *Disqualification of Federal Judges for Bias or Prejudice*, 46 U.Chi.L. Rev. 236, 243 & n.37, 244 (1978). In the final analysis, however, as noted by Judge Sirica, "the statute involved is not concerned with the actual state of mind of the judge or litigant but only with what the latter is willing to incorporate in an affidavit and counsel to indorse." *United States v. Mitchell*, 377 F.Supp. at 1316.

■ Finally, the Court would note, that since the amendment of section 455, many commentators and a few courts have indicated that the provisions of section 144 are subsumed into the provisions of section 455. While the amendment to section 455 affected that section, it did not affect the procedures and requirements under section 144. Whatever Congress intended under the amendment to section 455, it is clear that they did not alter the existing case law under section 144. Therefore, the Court' is duty bound to consider the affidavit in this case under the existing interpretation of section 144.

■ In this case, the affiants filed their affidavit on April 25, 1980, almost one month after the filing of their motion for

return of property. Affiants state that the motion and supporting affidavits could not be filed any earlier because compiling the information in the affidavit required them to search through thousands of documents and newspaper clippings. While this Court might properly conclude that the affidavit is untimely, the Court does not find that it was brought for purposes of delay and, therefore, it will consider the affidavit to have been timely filed. *See Bradley v. School Board of the City of Richmond, Virginia,* 324 F.Supp. 439 (E.D.Va.1971). The Court also finds that the affiants have complied with the other procedural aspects of the statute. A certificate of good faith has been filed with the affidavit and the facts stated with sufficient specificity that the Court can determine the legal sufficiency of the facts stated.

▪ Strictly construing the facts alleged in the affidavit, the Court finds that the affidavit is legally insufficient to require the Court to recuse itself with respect to any of the affiants. The affidavit is insufficient in two aspects. First, it fails to sufficiently demonstrate a *personal* bias or prejudice on the part of the Court. Contrary to the *conclusions* of the affiants, the facts do not demonstrate that the Court conducted any personal campaign aimed directly at the affiants, nor do the facts indicate any personal dislike or hatred for any of the affiants on the part of the Court. There is not even the mere suggestion in the affidavit that the Court conducted a personal vendetta against the affiants. Nor would any objective inquiry into the facts reveal any personal bias or prejudice against the affiants. Although, as Attorney General, the Court had several encounters with Joseph Balistrieri, nothing indicates that these encounters resulted from, or caused the presiding judge to form any feeling of personal bias or prejudice against him or the other affiants.

▪ That one lawsuit was filed against the Court by Joseph Balistrieri is not enough to establish any personal bias or prejudice. As a public official, and especially as Attorney General, the Court came to expect that a number of people would sue it. Exposure to such lawsuits is something all public officials must expect, and one cannot infer that such suits will result in any personal animosity toward the litigants.

▪ The second reason the affidavit is insufficient is that it fails to demonstrate that the events related in the affidavit caused the Court to "[form an] opinion on the merits [of this case] on some basis other than what the judge learned from his participation in [this] case." *United States v. Grinnell Corp.,* 384 U.S. at 583, 86 S.Ct. at 1710. The activities set out in the affidavit involved the failure of a number of business concerns to maintain proper insurance and to file their annual reports. These activities are vastly different from the activities which resulted in the issuing of the search warrants in this case. Because of the total lack of connection, it is unreasonable to infer that these events would cause the Court to form an opinion with regard to the merits of the matters now before the Court. Furthermore, the interim period of time between the facts stated and this action vitiates any possibility that any opinion formed then would have an effect on the Court's decision on the merits now. Therefore, the Court finds that the affidavit is not sufficient to necessitate its recusal under section 144.

## III. RECUSAL UNDER 28 U.S.C. § 455

Section 455 provides in part:

(a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party . . .

The statute also enumerates specific instances where a judge has a duty to disqualify himself from sitting in a case. These other subsections, however, are not relevant here because the alleged partiality

arises out of the Court's contacts with petitioners while it was serving as the Attorney General of Wisconsin.

#### A. Section 455(b)(1)

· Section 455(b)(1) is concerned with bias in fact. Consequently, the Court's prior analysis of bias in fact under section 144 is applicable here as well and the Court finds that petitioners' motion under section 455(b)(1) is without merit.

#### B. Section 455(a)

The closer and more difficult aspect of this motion involves the analysis under section 455(a).

 In 1974 Congress amended section 455(a) to eliminate the practice of judges, faced with close questions of recusal, to decide in favor of a "duty to sit." H.R.Rep. No.93–1453, 93rd Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, 6351, 6455. Under section 455(a), as amended, if there is any question of impropriety, a judge should exercise his discretion in favor of disqualification. *Id.; Potashnick v. Port City Construction Co.*, 609 F.2d 1101, 1112 (5th Cir. 1980).

 Section 455(a) has received a fair amount of consideration by courts and scholars. *See, e. g., Potashnick v. Port City Construction Co., supra*; *Blizard v. Frechette*, 601 F.2d 1217 (1st Cir. 1979); *SCA Services, Inc. v. Morgan*, 557 F.2d 110 (7th Cir. 1977); *United States v. Ritter*, 540 F.2d 459 (10th Cir.), *cert. denied, Olson Farms, Inc. v. United States*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976); *Smith v. Pepsico, Inc.*, 434 F.Supp. 524 (S.D.Fla.1977); 13 Wright, Miller & Cooper, Federal Practice & Procedure, § 3549 (1975); Comment, *The Elusive Appearance of Propriety: Judicial Disqualification Under Section 455*, 25 De-

Paul L.Rev. 104 (1975); Comment, *Disqualification of Federal Judges for Bias Under 28 U.S.C. Section 144 and Revised Section 455*, 45 Fordham L.Rev. 139 (1976); Note, *Judicial Disqualification in the Federal Courts: Maintaining an Appearance of Justice under 28 U.S.C. § 455*, 178 U. of Ill.L.F. 863 (1978). The concern under section 455(a) is with the appearance rather than the fact of bias or prejudice because "the appearance of partiality is virtually as important as the fact of impartiality." *Webbe v. McGhie Land Title Co.*, 549 F.2d 1358, 1361 (10th Cir. 1977). The test for recusal is whether a reasonable person knowing all of the circumstances might reasonably question the judge's impartiality. *See United States v. Ritter, supra*; *Smith v. Pepsico, Inc., supra.*

 Although a judge must disqualify himself under appropriate circumstances, the legislative history of section 455(a) indicates that the Court must act with deliberation and caution:

"in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a reasonable basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice." [1974] U.S. Code Cong. & Admin.News at 6355.[1]

---

1. While the 1974 amendments to section 455 removed the "duty to sit" rationale as a guideline in difficult cases, there can be no doubt that a court assessing with deliberation the reasonableness of a recusal request must consider the impact of the process of recusal upon the administration of justice in a district. A litigant is entitled to a fair and impartial judge but is not entitled to pick his judge. Nor should the system be such that the litigant can

control assignment of a case by the use of recusal petitions.

Those individuals who become members of the federal bench do not arrive there from some cloistered order. They are perforce persons who have engaged in public affairs, often as politicians or officials from the ranks of the executive branch of government. They are not sterile creatures who don judicial robes without any prior contacts in the community but rather

The burden of proof was set forth in *Blizard v. Frechette, supra,* where the court held that the petitioner need not demonstrate the appearance of impartiality beyond a reasonable doubt. All that is necessary is "some kind of probative evidence." 601 F.2d at 1221.

█ In considering recusal under section 455, however, the Court is not limited in its consideration by the facts disclosed in affidavits submitted by any party. In fact, it is the Court's duty to consider all evidence of bias or prejudice, whether revealed in the affidavit or not. In this instance, however, with few exceptions, the affidavit submitted by petitioners completely documents this Court's relationship with the petitioners. Since there is no evidence either from petitioners' affidavit or in the Court's knowledge which shows actual bias or prejudice, the inquiry must focus on the appearance of partiality standard of section 455(a).

█ The standard under section 455(a) is whether a reasonable person knowing all of the facts and looking at the circumstances at the present time would question the impartiality of the Court. It is important to note that even though the standard is subjective, the circumstances are viewed through the eyes of a reasonable person rather than a person who is highly sensitive.

The affidavit submitted by petitioners is largely a compilation of newspaper articles. These articles present much information but do not present the whole picture. Since an inquiry under section 455 requires an examination of all relevant facts, an understanding of the role and responsibility of the Attorney General's office is essential for evaluating the Attorney General's involvement in actions taken by the Court as such officer some ten years ago.

At the time the Court sat as Attorney General of the State of Wisconsin, the Attorney General's Office had almost 500 employees. The office was responsible for providing legal services and law enforcement services across the state. At any one time, literally thousands of cases were being prosecuted and defended by the Attorney General's Office. Case records were maintained by computers and although each case was brought in the name of the Attorney General, his personal knowledge of an individual case or a prosecution would be only such as would be made known to him in "justification memos" prior to commencing a lawsuit or in his staff meetings with the various units or in memoranda designed to keep the "front office" apprised of developments.

Not only did the Attorney General function as head of the State's legal services, but (more importantly as regards this affidavit) he also headed the State's newly-formed Criminal Investigation Division and the Organized Crime Bureau established as a subunit thereof.

As Attorney General, the Court had the duty to uphold and enforce the laws of Wisconsin. In exercise of that responsibility and upon instructions from the Governor, the Court, among other endeavors, developed an effort to attack organized crime, traditionally an area of major concern to competent law enforcement officials. As with other investigations emanating from

---

are very likely to be men and women with a broad exposure to all kinds of citizens of all shades of persuasion and background.

In this district there are four sitting district judges. One is a former governor, attorney general and practitioner; one a former state judge and supreme court justice; one a former attorney general, state senator and prosecutor; and one a former state judge, prosecutor, and practitioner. It is unrealistic to believe that such men would not be aware of a citizen who has had the notoriety in the public press that petitioner Frank Balistrieri has. Does this mean that if these officials have had prior official contact with petitioners they cannot pro-vide a fair impartial tribunal? Lawyers and judges by training learn to compartmentalize facts proven in court from extra-judicial impressions, rumors, and reputation. In previous matters involving the petitioners two of these four judges have recused themselves because of the kind of contacts complained of herein. Should the Court grant the motion before it, the result would be that any matters involving the petitioners would, of necessity, go to the remaining judge (who may well be in a similar position although he has only been on the federal bench here approximately ten months and hence has not yet faced the issue of recusal), or to another district.

the Attorney General's Office, this investigation was delegated to staff attorneys and investigators. The same procedures utilized with respect to other facets of the Attorney General's Office were utilized in this investigation.

Hence, the same lack of personal motivation and involvement which characterized the general legal work of the Department existed with respect to the organized crime effort. Press releases and public statements, as well as newspaper articles derived therefrom, invariably attributed to the Attorney General because he was the focal point of responsibility and policy control. Nonetheless, his personal knowledge of each individual case was slight.

During 1969 and 1970 a portion of the staff of the Office of the Attorney General of Wisconsin placed great emphasis on investigating "organized crime." In connection with this investigation, the Court, as Attorney General, pursued a course of action which concentrated on ensuring that Wisconsin corporations, and in particular taverns and night clubs, complied with state laws regarding, *inter alia*, corporation tax filings and workmen's compensation insurance. This intensive investigation, however, lasted less than eighteen months and concluded approximately ten years ago.

To conclude that this effort constituted a personal vendetta against the Balistrieri family would require a quantum leap in logic. A simple examination of the documents submitted as they relate to any extra–judicial relationship between the Court and each of the petitioners demonstrates the insufficiency of their motion.

In 1969, John J. Balistrieri, the first petitioner, was vice president of Arquebus, Inc., one of many corporations the State of Wisconsin brought suit against in that year seeking dissolution for failure to file reports required by law. The suit against Arquebus was dismissed after the corporation complied with the law and filed the necessary papers. Because the State achieved its purpose when the reports naming officers of the corporation were filed as required by law, the Attorney General's Office did not object to dismissal.

The documents supplied by the petitioners show no other contacts between the Attorney General's Office and John J. Balistrieri. His name was not mentioned in any of the 37 other newspaper articles, nor in any of the court documents supplied. Furthermore, the Court has never met John Balistrieri.

The one encounter between the Attorney General's Office and John J. Balistrieri is insufficient to require recusal under section 455(a). The 1969 action was brought to compel compliance with state law and was dismissed without objection when that goal was achieved. There is no question in the Court's mind that the one suit filed and dismissed over ten years ago fails to show that the impartiality of the Court would be questioned by a reasonable person.

Turning to Frank P. Balistrieri, the Court again must ask itself whether a reasonable person, knowing all the facts and looking at the circumstances *at the present time*, would question the impartiality of the Court.

The documents provided by the petitioners point to actions taken by the Attorney General against nine businesses. Attachment 5, which was discussed in connection with John Balistrieri, lists five corporations. Numerous articles refer to actions later taken against four other businesses: The "Ad Lib," "Kings IV," "The Scene" and "The Brass Rail." Although the newspaper articles stated these businesses were linked to Frank P. Balistrieri, City of Milwaukee records examined at that time showed no official link between Frank P. Balistrieri and the four taverns. (Att.15). Moreover, of the five corporations involved in the 1969 action, only two listed any Balistrieri as an officer and neither of those listed Frank P. Balistrieri as an officer.

Since none of the actions taken by the Attorney General in 1969–1970 were taken against corporations in which Frank P. Balistrieri had an acknowledged interest, his grounds for seeking disqualification must be related to other actions taken or statements made by the Court as Attorney Gen-

eral. The newspaper articles submitted make numerous allegations to the effect that Frank P. Balistrieri controlled the corporations against which the Attorney General's Office took action. The issue before the Court, however, is not of the impartiality of the newspapers but rather the appearances of its own impartiality. Consequently, it is necessary to look at statements coming out of the Attorney General's Office rather than only statements made by journalists.

In Attachment 3, the Milwaukee Journal stated a report coming from the Wisconsin Attorney General's Office named Frank J. Balistrieri as head of the Milwaukee Mafia Family. When asked to elaborate on the report, the Attorney General's Executive Secretary stated that the report would not be expanded on. This refusal by the Attorney General's Executive Secretary to elaborate on the report demonstrates a concern for fairness and objectivity rather than prejudice. Furthermore, the Attorney General's lack of personal bias was demonstrated when he stated in Attachment 1 that "intelligence reports are one thing and provable evidence another."

In Attachment 40, the Attorney General was quoted in an article in the Milwaukee Sentinel on organized crime as saying:

> We had to start at the bottom with some rather mundane things. For example, we found that the Balistrieri family had not been filing annual reports.

The article stated that the suits were dismissed after the corporations filed the required reports. That the State of Wisconsin agreed to the dismissal of the suits after the law was complied with demonstrates that the Attorney General's concern was with compliance with the law.

To say that attempts by the Attorney General's office to compel businesses reputedly linked to Frank Balistrieri to comply with state laws constituted harassment or a personal vendetta against him ignores the responsibility the Court had as Attorney General. Had the Court not acted when it became aware that laws were being violated, it would have been remiss in its duties as Attorney General. Furthermore, the commencement of dissolution suits against corporations that failed to comply with reporting requirements was not confined to Balistrieri related enterprises. The Attorney General's office moved against many other corporations for the same reason–*i. e.,* to enforce compliance with the laws of the state. The Court recalls with clarity the irate calls of various friends and political supporters whose corporations were ensnared in the same embarrassing predicament. This was part of the distasteful and unpopular–yet assigned duties of the Attorney General akin to the immensely unpopular task of raiding church picnics and volunteer fire department fund raisers to enforce the then existing statutes regarding gambling and lotteries.

The Court does not deny that, as Attorney General, it received reports naming Frank Balistrieri as the head of the Mafia. But the Court can state with a clear conscience that it does not harbor nor has it ever harbored any feelings of ill will, prejudice or bias against Frank Balistrieri.

■ The actions taken by the Court with respect to Frank Balistrieri, both during its tenure as Attorney General and after leaving that office, support the Court's conclusion that no reasonable person would question its impartiality at the present time. First, the Court has never met or spoken with Frank Balistrieri. Second, in its six–year tenure as Attorney General, the Court, to its recollection, never instituted any actions against Frank Balistrieri personally, or any business enterprises in which he had a declared interest. Finally, in the six years since it left the Attorney General's Office, the Court has no recollection of being involved with judicial proceedings relating to the affairs of Frank Balistrieri with the sole exception of certain electronic surveillance and search warrant applications which gave rise to the present action.

The final petitioner seeking recusal is Joseph P. Balistrieri. He is also a son of Frank Balistrieri and was listed as an officer in several of the corporations the state acted against in 1969 and 1970. In addition, he was a plaintiff in the suit filed against the Court as Attorney General.

Again, the Court takes the position that the actions taken against those corporations were rightfully instituted in accordance with the law and not brought due to any personal bias or prejudice against the petitioner.

That Joseph Balistrieri sued the Court over ten years ago would not cause one to assume that the Court had any animosity toward the petitioner. As stated earlier, when acting as Attorney General, the Court had numerous lawsuits filed against it. To assume that the Court would hold a grudge against any of those persons who instituted actions against it is simply incorrect. Finally, it is important to note that petitioner Joseph Balistrieri has made numerous appearances before this Court and has never questioned its impartiality. While the appearances do not constitute waiver, they are factors important to a reasonable person looking for an appearance of impartiality. Considering all the above circumstances, the Court finds that a reasonable person would not at the present time question the impartiality of the Court with respect to Joseph P. Balistrieri.

In summary, the petitioners have failed to show that a reasonable person would question the impartiality of the Court at the present time. The events discussed in the affidavit were of limited scope and duration and occurred nearly a decade ago. The articles and other relevant facts brought out above disclose no personal bias or prejudice. Instead, the affidavit and articles disclose that, the involvement of the Court was due to its position as Attorney General and pursuant to the responsibilities of that office. Moreover, at least one petitioner has appeared a number of times before this Court as counsel for various litigants without feeling it necessary to raise the issue of bias and prejudice, and the Court has never met the other petitioners.

Based on the foregoing, recusal under 28 U.S.C. §§ 144, 455(a) and 455(b) must be and is hereby denied. During the pendency of this motion, the Court was assigned another matter, 80–Misc.–43, involving the same litigants. Relying on the documents in 80–Misc.–34M to 42M, the petitioners moved for recusal in that action as well.

For the above–stated reasons, the Court finds that that motion also must be and is hereby denied.

Questions of prejudice and bias run to the very heart of the quality of justice rendered in our system. This particular motion and its resolution have caused the Court to do a great deal of pondering and introspection. While the decision has been made in good conscience with full appreciation of the Court's responsibilities, it cannot be said to be devoid of uncertainty. The demise of the "duty to sit" doctrine and the amendment of section 455(a) regarding "any proceeding in which his impartiality might reasonably be questioned" make certain analysis very difficult. For that reason, the Court, having made the decision which it feels is correct, would welcome swift appellate review and would encourage either party to seek the wisdom of the Circuit Court of Appeals.

This is desirable for greater clarity in the law and also to provide validity to subsequent proceedings in the multitude of affidavits, motions, and petitions which have swirled around this matter.

